UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

S<span>HARON</span> L<span>AND</span> )
    *Plaintiff*, )
)
*vs*. ) 2:11-cv-00213-JMS-DKL
)
M<span>ICHAEL</span> J. A<span>STRUE</span>, Commissioner of Social )
Security )
    *Defendant*. )
)

## **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Sharon Land applied for disability insurance benefits ("DIB") and Supplemental Security Income Benefits ("SSI") through the Social Security Administration ("SSA") in May 2009. [R. 11; dkt. 11-2 at 12.] After a hearing in July 2010 before Administrative Law Judge ("ALJ") Gary L. Vanderhoof, the ALJ deemed her disabled for the closed period of May 15, 2009 to June 22, 2010. The Appeals Council denied Ms. Land's timely request for review of the ALJ's decision, rendering that decision the final one for the purposes of judicial review. 20 C.F.R. § 404.981. Ms. Land then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the ALJ's decision.

### B<span>ACKGROUND</span>

**A. Pertinent Medical Evidence**

The following are the relevant facts as outlined by the Commissioner and adopted by Ms. Land as an accurate detailing of evidence, [dkt. 14 at 1]. On May 15, 2009, Ms. Land was attacked by her son, resulting in the destruction of her right eye, serious injury to her left eye, a rib fracture, and a fractured ring finger. [R. 228, 237-41; dkt. 11-7 at 29, 38-42.] Dr. Harold Lee performed surgery on her eyes, including enucleation of the right eye and repair of her left eye. [R. 237-38; dkt. 11-7 at 38-39.]

On June 4, 2009, Ms. Land saw Dr. Hua Gao, an opthamologist, for evaluation of her vision. [R. 281-82; dkt. 11-7 at 82-83.] Dr. Gao noted that Ms. Land's left eye vision was 20/400, but pinholed to 20/150. [R. 281; dkt. 11-7 at 82.] Dr. Gao expected Ms. Land's vision to improve as the vitreous hemorrhage dissolved. [*Id.*] On June 11, 2009, Ms. Land followed-up with Dr. Lee, who noted that Ms. Land was doing well and had improved in her left eye, to near 20/80. [R. at 284-85; dkt. 11-7 at 85-86.]

On June 18, 2009, Dr. Steve Kissel, Ms. Land's regular primary physician, wrote a note in which he stated that Ms. Land was dependent on narcotics to manage her pain and needed Xanax to help control her anxiety. [R. 292; dkt. 11-7 at 93.] Dr. Kissel also noted that there were restrictions with any vision-related activity, as well as concentration and "socializations." [*Id.*]

In July 2009, Dr. Gao noted that Ms. Land's left eye vision had improved to 20/70, pinholed to 20/40. [R. 327; dkt. 11-7 at 128.]

On August 7, 2009, Ms. Land underwent a consultative examination with Dr. David Zauel. [R. 328-31.] Testing showed that Ms. Land's left eye was 20/200, and he diagnosed a cataract and corneal scars. [R. 329-30; dkt. 11-8 at 3-4.] Dr. Zauel recommended cataract surgery and stated that hopefully her vision would improve with the surgery. [R. 331; dkt. 11-8 at 5.] He opined that Ms. Land was unable to drive, operate moving machinery, or fine or medium detail work. [*Id.*] On August 11, 2009, Ms. Land was evaluated by Dr. Daniel Spitzberg, who indicated that the cataract in her left eye prevented her from driving or reading. [R. 350; dkt. 11-8 at 24.] The following day, Dr. Spitzberg performed cataract surgery on Ms. Land's left eye. [R. 351, 353, 364-65; dkt. 11-8 at 24, 26, 38-39.] Afterward, Ms. Land reported that her vision was better, and it was noted that her left eye was 20/40. [R. 370; dkt. 11-8 at 44.]

On September 1, 2009, Ms. Land underwent a consultative evaluation with Albert Fink, Ph.D. [R. 378-80; dkt. 11-8 at 52-54.] Dr. Fink noted that Ms. Land was remarkably cheerful, spoke logically and fluently, and her gait and coordination were unremarkable. [R. 379; dkt. 11-8 at 53.] She reported that she had trouble sleeping, had no difficulties with personal care, was able to cook if directions were read to her, did not do laundry, and found it difficult to do housework consistently. [*Id*.] Dr. Fink opined that, from a cognitive/affective perspective, Ms. Land appeared competent to function in typical work environments and social settings. [R. 379-80; dkt. 11-8 at 53-54.] Dr. Fink diagnosed Ms. Land with anxiety NOS, assigned her a Global Assessment of Functioning ("GAF") score[1] of 60 and indicated that her anxiety did not appear to be a impediment to functioning. [*Id*.]

On September 2, 2009, Ms. Land followed-up with Dr. Lee. [R. 385; dkt. 11-8 at 59.] Dr. Lee noted that Plaintiff's left eye was 20/50, and pinholed to 20/30. [*Id*.] He also noted that Ms. Land would be obtaining a prosthesis for her right eye. [*Id*.]

On September 8, 2009, state reviewing agency physician, William Shipley, Ph.D., completed a psychiatric review technique form. [R. 400-12; dkt. 11-8 at 74-76.] Dr. Shipley noted Dr. Fink's statement that "[f]rom a cognitive/affective perspective, the claimant appears competent to function in typical work environments and social settings[,]" and opined that Plaintiff's anxiety disorder was not a severe impairment. [R. 400, 405, 412; dkt. 11-8 at 74, 79, 86.]

On September 9, 2009, state agency reviewing physician Dr. Fernando Montoya completed a physical residual functional assessment. [R. 414-21; dkt. 11-8 at 88-95.] Dr. Montoya

---

[1] A GAF score is a numerical assessment of psychological, social, and occupational functioning. The scale is 1-100. A GAF score in the range of 41-50 indicates "serious symptoms ... or any serious impairment in psychological, occupational, or social functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Revision 2000).

opined that there were no extertional limitations established, but that Ms. Land had limited near acuity, far acuity, and depth perception. [R. 415, 417; dkt. 11-8 at 89, 91.]

On September 16, 2009, Dr. Spitzberg noted that Ms. Land had "done excellent following cataract surgery to the left eye and is now 20/20." [R. 492; dkt. 11-9 at 72.] Dr. Spitzberg recommended glasses. [*Id*.] In December 2009, Dr. Spitzberg noted that Ms. Land required a change in glasses and that her visual acuity was 20/25. [R. 493; dkt. 11-9 at 73.]

In February 2010, Ms. Land asked Dr. Kissel for a referral for evaluation of drainage of tear ducts. [R. 508; dkt. 11-10 at 15.] In February and March 2010, Ms. Land was evaluated by Dr. Richard Burgett for complaints of discomfort with her right eye prosthetic. [R. 544, 546; dkt. 11-10 at 51, 53.] On April 21, 2010, she followed-up with Dr. Burgett, who noted that Ms. Land had moderate conjunctival cysts which were affecting the prosthetic. [R. 542; dkt. 11-10 at 49.] Ms. Land expressed interest in the surgical removal of the cysts. [*Id*.] On May 3, 2010, Dr. Burgett removed the cysts. [R. 562, 577-78; dkt. 11-10 at 69, 84-85.]

On May 21, 2010, Ms. Land underwent an evaluation for occupational therapy with Susan Crook. [R. 586-87; dkt. 11-10 at 93-94.] Ms. Land reported that she experienced difficulty at home including walking into things, distinguishing certain colors, getting dressed, preparing food, and finding items. [R. 586; dkt. 11-10 at 93.] Ms. Crook indicated Ms. Land's goals in therapy were to be able to compensate for her vision by learning how to travel safely, safely use feeding utensils, and to utilize community resources. [R. 587; dkt. 11-10 at 94.] Ms. Land was seen for four occupational therapy appointments. [R. 592; dkt. 11-10 at 99.]

On June 22, 2010, Ms. Land was discharged from occupational therapy. [R. 592.] In a letter to Dr. Kissel, Ms. Crook noted that Ms. Land had improved and was ready to work on her

own to further improve her activities of daily living and mobility skills. [R. 592-93; dkt. 11-10 at 99-10.]

On June 28, 2010, Dr. Kissel completed a medical source statement regarding Ms. Land's ability to perform work-related activities. [R. 644-49; dkt. 11-11 at 52-57.] Dr. Kissel indicated that, due to her compromised vision, Ms. Land was unable to lift more than 10 pounds;[2] was limited to brief walking; required a cane; could only occasionally use her hands; never use foot controls; should not work at unprotected heights, around moving machinery, or operate a motor vehicle; could tolerate occasional exposure to humidity, environmental irritants, cold, heat, and vibrations. [R. 644-48; dkt. 11-11 at 52-56.] Dr. Kissel attributed some of Ms. Land's restrictions to pain due to rheumatoid arthritis, a condition for which Ms. Land had received treatment over several years. Finally, he indicated that Ms. Land could not perform activities such as shopping, travel without a companion, walk a block on rough or uneven surfaces, or sort paper/files. [R. 649; dkt. 11-11 at 57.]

### B. Hearing Testimony

#### 1. Medical Expert's Testimony

Dr. Ernest Gregory, a board certified surgeon, testified as a neutral medical expert at the administrative hearings. [R. 31-36; dkt. 11-2 at 32-37.] Dr. Gregory testified that Ms. Land's major problem was the injury to her eyes, and that she would have possible problems with her depth perception. [R. 31; dkt. 11-2 at 32.] Dr. Gregory noted that Ms. Land suffered total destruction and a serious injury to her left eye. [R. 32, 35; dkt. 11-2 at 33, 36.] Dr. Gregory also discussed Ms. Land's rheumatoid factor and opined that she was unable physically to do any-

---

[2] Dr. Kissel's assessment equates to a range of sedentary work, defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

thing heavier than light work. [R. 32-33; dkt. 11-2 at 33-34.] Dr. Gregory also testified that Ms. Land should not work at unprotected heights or around dangerous machinery, and she should have a cleaning working environment. [R. 33; dkt. 11-2 at 34.] Under questioning from Ms. Land, Dr. Gregory stated that there was no medical documentation of rheumatoid problems with Ms. Land's hands. [R. 34; dkt. 11-2 at 35.]

Susan Pelzer, Ph.D., a clinical psychologist, also testified as a neutral medical expert at the hearing. [R. 36-42; dkt. 11-2 at 37-43.] Dr. Pelzer noted the attack on Ms. Land by her son, reviewed Dr. Fink's August 2009 mental status examination, and summarized the course of her recovery through May 2010. [R. 37; dkt. 11-2 at 38.] Dr. Pelzer stated that Plaintiff did not meet or medically equal any listed impairment. [R. 38; dkt. 11-2 at 39.] Dr. Pelzer testified that Ms. Land was disabled for a closed period from the date of her injury, May 15, 2009, until the date of her discharge from occupational therapy on June 22, 2010. [R. 36, 38; dkt. 11-2 at 37, 39.] Dr. Pelzer noted that Dr. Fink found that Ms. Land was competent cognitively and affectively, but opined that Ms. Land's marked limitations in her ability to function independently rendered her incapable of work until she was discharged from occupational therapy. [R. 38, 40; dkt. 11-2 at 39, 41.] Dr. Pelzer opined that following her discharge, Ms. Land experienced moderate limitations in activities of daily living; mild difficulties with concentration, persistence, and pace; and mild limitations in social functioning. [R. 39; dkt. 11-2 at 40.]

### 2. Ms. Land's Testimony

Ms. Land testified at the hearing that she experienced problems with her depth perception, had trouble sleeping, had migraine headaches about twice a month, had trouble walking down certain steps, and sometimes had trouble picking up small items. [R. 43, 50-51, 54-55, 57; dkt. 44, 51-52, 55-56, 58.] Despite her visual problems, she stated that she did some light

housework, walked her dog, shopped, attended church, tended a flowerbed, and was able to read and write. [R. at 43-44, 46-48, 52-53, 57; dkt. 11-2 at 44-45, 47-49, 53, 55, 58.]

### 3. Vocational Expert's Testimony

Ronald Malik testified as a neutral vocational expert ("VE") at the hearing. [R. 58-64; dkt. 11-2 at 59-65.] The ALK asked the vocational expert to consider a hypothetical individual with Ms. Land's vocational characteristics, who could perform light work, with the following additional limitations: a clean working environment (free from odors, dust, gases, and poor ventilation); difficulty with depth perception; no climbing; no working at unprotected heights or around dangerous moving machinery; moderate restrictions of activities of daily living; mild difficulties with concentration, persistence, or pace; and mild limitations in social functioning. [R. 58-59; dkt. 11-2 at 59-60.] In response, the VE testified that Ms. Land could perform her past relevant work as an office manager an administrative clerk. [R. 59; dkt. 11-2 at 60.] In addition, the VE identified unskilled, light sedentary work that could be performed with only occasional handling and fingering, including jobs as a rental consultant (2,000 positions in Indiana and 179,800 nationally), a call out operator (1,000 positions in Indiana and 23,600 nationally), and an office clerk (1,200 positions in Indiana and 67,600 nationally). [R. 62-63; dkt. 11-2 at 63-64.]

### 4. Administrative Law Judge's Decision

The ALJ found that Ms. Land had the following severe impairments: loss of the right eye, left eye damage, and anxiety. [R. 15; dkt. 11-2 at 16.] Based on the testimony of Dr. Pelzer, the ALJ found that Ms. Land was disabled for a closed period from May 15, 2009, through June 22, 2010. [R. 15-18; dkt. 11-2 at 16-19.] Starting June 23, 2010, however the ALJ found that Ms. Land improved medically with her discharge from occupational therapy. [R. 18; dkt. 11-2 at 19.] The ALJ determined that Ms. Land did not meet or medically equal any listed impairment, spe-

cifically finding that she did not meet the criteria for blindness under Listing 2.02. [R. 17-19; dkt. 11-2 at 18-20.] The ALJ considered Ms. Land's allegations, but found that her allegations of disability were not credible to the extent they were inconsistent with his finding that she retained the capacity to perform a range of light work. [R. 19-20; dkt. 11-2 at 20-21.] Based on the testimony of the vocational expert, the ALJ found that Ms. Land was able to perform her past work as an office manager and administrative clerk. [R. 20; dkt. 11-2 at 21.] Alternatively, the ALJ found that Ms. Land had the residual functional capacity to perform a significant number of other jobs in the national economy as identified by the vocational expert. [*Id.*] Accordingly, the ALJ determined that starting June 23, 2010, Ms. Land was no longer under a disability. [R. 11-12, 21; dkt. 11-2 at 13, 22.]

## DISCUSSION

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the Commissioner's) findings. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted). If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. Otherwise the Court must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

To evaluate a disability claim, an ALJ must use the following five-step inquiry:

(1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can [she] perform her past relevant work, and (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted). After Step Three, but before Step Four, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which represents the claimant's physical and mental abilities considering all of the claimant's impairments. The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and, if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 416.920(e).

Here, Ms. Land claims the ALJ committed various errors at Steps 3 and 4. [Dkt. 14 at 1-10.] Specifically, Ms. Land raises the following six issues: (1) whether newly adduced evidence warrants remand under the sixth sentence of 42 U.S.C. § 405(g); (2) whether the ALJ erred in finding that Ms. Land's impairments did not meet or equal a Listing; (3) whether the ALJ erred in finding that Ms. Land had experienced medical improvement; (4) whether the ALJ properly evaluated the credibility of Ms. Land's symptom testimony; (5) whether the ALJ properly determined Ms. Land's residual functional capacity; and (6) whether the ALJ erred in concluding that Ms. Land could perform her past relevant work. [*Id.*] The Court will consider each claim in turn.

**1. Remand Under the Sixth Sentence of 42 U.S.C. § 405(g)**

With her initial brief challenging the Commissioner's decision regarding her disability claim, Ms. Land submitted additional evidence to the Court. [*See* dkt. 13-1.] As stated in its

most recent entry on the matter, the Court will consider the evidence only to determine whether the case merits remand pursuant to the sixth sentence of 42 U.S.C. § 405 (g). [Dkt. 24.]

Sentence six of 42 U.S.C. 405(g) permits a reviewing court to remand a case, without ruling on the merits, upon a showing that the additional evidence is new and material and that the claimant had good cause for her failure to incorporate the evidence into the record during the prior proceeding. 42 U.S.C. 405(g); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) ("Perkins has not shown good cause for his failure to include Dr. Reich's evaluation into the earlier record."); *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) ("New evidence is material if there is a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." (internal quotation marks and citation omitted)).

Although the Commissioner first argues that remand under sentence six would be inappropriate because Ms. Land did not clearly request remand, the Court rejects that argument, noting that Ms. Land did make specific mention to this Court's ability to remand, [dkt. 14 at 13], and that, as a *pro se* claimant, her argument is to be liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."). The Court will therefore proceed to evaluate the materiality of the additional evidence Ms. Land has submitted.

Here, the Court finds that Ms. Land is not entitled to remand under sentence six. To satisfy the materiality requirement of sentence six, Ms. Land must show that new evidence is relevant to the time period adjudicated by the ALJ. *Schmidt*, 395 F.3d at 742. ("[N]ew evidence is material only if it is relevant to the claimant's condition during the relevant time period encompassed by the disability application under review."); *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th

Cir. 1989) (providing that new evidence is not material if it only addresses a claimant's posthearing condition, but not his condition prior to the hearing.) She has not done so here; all of the evidence she has submitted is dated after the ALJ's decision, [*see* dkt. 13-1], specifically September 2010, and therefore cannot be deemed material. *See Schmidt*, 395 F.3d at 742 ("[M]edical records 'postdating the hearing' and that 'speak only to [the applicant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration' do not meet the standard for new and material evidence" (quoting *Kapusta*, 900 F.2d at 97)). Therefore, the Court therefore finds that Ms. Land's claim does not merit remand under the sixth sentence of 42 U.S.C. § 405(g).

### 2. Remand Under the Fourth Sentence of 42 U.S.C. § 405(g)

Ms. Land also argues that the ALJ improperly concluded that her impairments did not meet or medically equal a listing as of June 22, 2010. [Dkt. 14 at 1.] Specifically, Ms. Land contends that the ALJ's opinion that she did not meet or medically equal a listing for vision impairment is not substantiated by evidence in the record and that he neglected to consider her limited field of vision. [*Id*.] The Court agrees.

Listing 2.02 is met when the claimant's "[r]emaining vision in the better eye after best correction is 20/200 or less." 20 C.F.R. Part 404, Subpt. P, App. 1 § 2.02. The ALJ specifically considered this criterion in determining that Ms. Land did not meet or medically equal Listing 2.02, noting that Ms. Land's visual acuity in her left eye was 20/20 following cataract surgery 20/25 in December 2009. [R. 16-17; 493; dkts. 11-2 at 17-18; 11-9 at 73.]

Ms. Land concedes that she does not meet acuity requirements of Listing 2.02 because of her corrected vision. [Dkt. 13 at 9.] She argues, however, that her restricted 20 degree field of vision meets other requirements under the Social Security Administration's definition of statuto-

ry blindness in Listings 2.02 and 2.03. [*Id.*] Here, the ALJ failed to discuss Ms. Land's field of vision anywhere in his opinion. In the absence of such discussion, the Court is unable to conclude that the ALJ's Step 3 determination is supported by substantial evidence.

That is not the ALJ's only omission. He wholly failed to mention Ms. Land's rheumatoid arthritis during his RFC determination. Within the record is Dr. Kissel's opinion regarding limitations Ms. Land suffers partly due to her rheumatoid arthritis, [R. 642, 644-49; dkt. 11-11 at 50, 52-57], and while the ALJ apparently discounts a portion of Dr. Kissel's opinion in light of conflicting opinions from other physicians regarding Ms. Land's exertional limitations, [R. 16-17; dkt. 11-2 at 17-18], because those other physicians opinions also contained no discussion of Ms. Land's arthritis, the ALJ has no apparent rationale for discounting Dr. Kissel's opinion about Ms. Land's restrictions related to arthritic pain. Furthermore, Ms. Land's rheumatoid arthritis is clearly documented elsewhere in the record, [R. 203-226; dkt. 11-7 at 4-25].

For those reasons, the Court cannot say that the ALJ's decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Barnett*, 381 F.3d at 668, and finds that a reversal of the ALJ's decision is in order. The record is not so clear, however, that this Court can award or deny benefits to Ms. Land. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005) ("When an ALJ's decision is not supported by substantial evidence, an award of benefits by the court is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion.") (citing 42 U.S.C. § 406(g)). Therefore, the Court finds it proper to remand the matter for proper disability determination.

In the interest of efficiency, the Court further orders the ALJ to consider any additional evidence Ms. Land may seek to submit regarding her claims of continuing or present disability.

*See Campbell v. Shalala*, 988 F.2d 741, 744-45 (7th Cir. 1993) ("[W]e make it clear that we are remanding pursuant to sentence four, not sentence six. Any additional relevant evidence [the claimant] desires to submit, however, should be considered on remand.").

## CONCLUSION

The Court finds that Ms. Land's claim warrants remand under the fourth sentence of 42 U.S.C. 405 (g). Therefore, the Court **REVERSES** the Commissioner's partial denial of benefits and **REMANDS** the matter to the ALJ for further consideration.

06/25/2012

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via USPS**

Sharon Land
205 W. Walnut Street
Greencastle, IN

**Distribution via ECF:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov